THE STATE OF OHIO, APPELLEE, *v.* NOLING, APPELLANT.

[Cite as *State v. Noling,* 136 Ohio St.3d 163, 2013-Ohio-1764.]

*Criminal law—R.C. 2953.73—Postconviction DNA testing—Appellate jurisdiction—R.C. 2953.73(E)(1), which grants exclusive jurisdiction to the Supreme Court of Ohio to review rejections of applications for DNA testing in cases in which the death penalty is imposed, is constitutional— Before dismissing a subsequent application for postconviction DNA testing under R.C. 2953.72(A)(7), a trial court must apply the definition of "definitive DNA test" set forth in R.C. 2953.71(U) and the criteria of R.C. 2953.74.*

(No. 2011-0778—Submitted January 8, 2013—Decided May 2, 2013.)

APPEAL from the Court of Common Pleas of Portage County, No. 95 CR 220.

_____

SYLLABUS OF THE COURT

1. R.C. 2953.73(E)(1), which grants exclusive jurisdiction to the Supreme Court of Ohio to review rejections of applications for DNA testing in cases in which the death penalty is imposed, is constitutional.

2. Before dismissing a subsequent application for postconviction DNA testing under R.C. 2953.72(A)(7), a trial court must apply the definition of "definitive DNA test" set forth in R.C. 2953.71(U) and the criteria of R.C. 2953.74.

_____

LANZINGER, J.

{¶ 1} Tyrone Noling, the defendant-appellant in this capital case, has appealed from an order of the Court of Common Pleas of Portage County rejecting his second application for postconviction DNA testing. Two issues are

presented: (1) whether R.C. 2953.73(E)(1) is constitutional in conferring appellate jurisdiction upon this court from a trial court's denial of postconviction DNA testing in a case in which the death penalty was imposed and (2) whether R.C. 2953.72(A) bars a subsequent application for postconviction DNA testing when a prior application was rejected under previous versions of the DNA-testing statutes.

{¶ 2} We hold that R.C. 2953.73(E)(1) is constitutional. We also hold that before dismissing a subsequent application for postconviction DNA testing under R.C. 2953.72(A)(7), a trial court must apply the definition of "definitive DNA test" set forth in R.C. 2953.71(U) and the criteria of R.C. 2953.74.

## I. Factual Background

{¶ 3} Noling was found guilty of the April 1990 aggravated murders of Bearnhardt and Cora Hartig in Portage County, Ohio. He was sentenced to death on two counts. Both the court of appeals and this court affirmed the convictions and death sentences. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88. Although this case has an extensive postconviction history, the only issue now before us is Noling's request for postconviction DNA testing under R.C. 2953.71 to 2953.81.

{¶ 4} In his first postconviction application on September 25, 2008, Noling sought DNA testing of a cigarette butt found on the driveway of the Hartig home. Noting that a DNA test conducted before trial had already excluded Noling as well as each codefendant as the person who had smoked the cigarette, the trial court rejected Noling's application because it found the earlier DNA test to be definitive.

{¶ 5} On April 10, 2009, Noling appealed the entry rejecting his application to the Eleventh District Court of Appeals. The court of appeals dismissed the appeal for lack of jurisdiction under R.C. 2953.73(E)(1). *State v. Noling*, 11th Dist. No. 2009-P-0025, 2009-Ohio-3789, ¶ 9. Noling also filed a

notice of appeal of the trial court's rejection of his DNA application with this court while his appeal was pending in the Eleventh District. On September 29, 2010, we declined to accept Noling's appeal of the trial court's decision. *State v. Noling*, 126 Ohio St.3d 1582, 2010-Ohio-4542, 934 N.E.2d 355.

{¶ 6} On December 28, 2010, Noling filed a second application for DNA testing of the cigarette butt based on newly discovered evidence that he asserted identifies other suspects in the Hartig murders. First, Noling alleged that the prosecution had failed to disclose a statement made by Nathan Chesley that inculpated his foster brother, Daniel Wilson, in the Hartig murders. Chesley, in an affidavit supporting the application, described Wilson as a heavy drinker and a violent person who had committed thefts and broken into homes at the time of the Hartig murders. He also stated that Wilson drove a blue Dodge Omni—a dark blue, midsize car was seen by another witness near the Hartig residence on the day of the murders. According to Noling, previous analysis of the cigarette butt and of Wilson's saliva did not exclude Wilson as the source of the DNA on the cigarette. Second, Noling's application alleged that documents that were previously undisclosed by the state identified other possible suspects, including the Hartigs' insurance agent, who had borrowed money from the Hartigs but had defaulted on the loan. Noling also claimed that because of advances in DNA technology, it is now possible to positively identify the individual whose DNA is on the cigarette butt and that DNA identification of one of the previously undisclosed suspects would be "outcome determinative," because it would identify the true killer.

{¶ 7} On March 28, 2011, the trial court denied Noling's second application, stating:

> Revised Code 2953.72(A)(7) states that "If the court rejects
> an eligible offender's application for DNA testing because the

offender does not satisfy the acceptance criteria described in Division (A)(4) of this section, the court will not accept or consider subsequent applications."

In this case Defendant Tyrone Noling submitted a properly filed application for post conviction testing on September 25th 2008, the Court rejected that application and the Defendant appealed to the Supreme Court. Therefore, as this is a statutory action, the Court must reject Defendant's second filing of the application for DNA testing based on Ohio Revised Code §2953.72(A)(7).

{¶ 8} We accepted jurisdiction of Noling's appeal on October 19, 2011, on the following proposition of law: "Whether an application for post-conviction DNA testing rejected under the old acceptance criteria set by the Legislature must be considered under the Legislature's new acceptance criteria rather than be procedurally barred by R.C. 2953.72(A)(7)." 129 Ohio St.3d 1503, 2011-Ohio-5358, 955 N.E.2d 386. Later, in light of *State v. Davis*, 131 Ohio St.3d 1, 2011-Ohio-5028, 959 N.E.2d 516, we ordered the parties to address the constitutionality of R.C. 2953.73(E)(1), which confers exclusive jurisdiction upon this court to consider Noling's appeal. 131 Ohio St.3d 1471, 2012-Ohio-896, 962 N.E.2d 802.

{¶ 9} The threshold question in this case is whether we have jurisdiction to consider Noling's direct appeal of the trial court's rejection of his second application for DNA testing.

## II. Analysis

*A. Appellate Jurisdiction in Death-Penalty Cases*

{¶ 10} As we recently stated, "Subject-matter jurisdiction cannot be waived and is properly raised by this court sua sponte. *State v. Lomax*, 96 Ohio

St.3d 318, 2002-Ohio-4453, 774 N.E.2d 249, ¶ 17." *Davis*, 131 Ohio St.3d 1, 2011-Ohio-5028, 959 N.E.2d 516, ¶ 11.

{¶ 11} On November 8, 1994, Ohio voters approved amendments to the Ohio Constitution that give this court appellate jurisdiction in direct appeals from courts of common pleas in cases in which the death penalty has been imposed. Ohio Constitution, Article IV, Section 2(B)(2)(c). Before the amendments, a trial court's judgment could be appealed—as in any criminal case—to a district court of appeals. A second appeal as of right could then be filed in this court. The amendments eliminated review by the courts of appeals of judgments that sentenced a defendant to death for a crime that occurred on or after January 1, 1995. Ohio Constitution, Article IV, Section 3(B)(2). According to the joint resolution that placed the issue on the ballot, the amendments to Article IV, Sections 2 and 3 of the Ohio Constitution were intended "to give the Supreme Court jurisdiction in direct appeals in death penalty cases as a matter of right, thus removing the jurisdiction of the courts of appeals on direct review in death penalty cases." Sub.H.J.Res. No. 15, 145 Ohio Laws, Part IV, 7811.

{¶ 12} The Ohio Constitution, Article IV, Section 2(B)(2)(c) now provides: "The supreme court shall have appellate jurisdiction as follows: * * * In direct appeals from the courts of common pleas or other courts of record inferior to the court of appeals as a matter of right in cases in which the death penalty has been imposed." The following section, Article IV, Section 3(B)(2), which relates to the jurisdiction of the courts of appeals, states:

> Courts of appeals shall have such jurisdiction as may be provided by law to review and affirm, modify, or reverse judgments or final orders of the courts of record inferior to the court of appeals within the district, except that courts of appeals

shall not have jurisdiction to review on direct appeal a judgment
that imposes a sentence of death.

Thus, courts of appeals were excluded from the direct appellate review of death sentences.

{¶ 13} We first addressed the 1994 amendments in *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997). In *Smith*, this court upheld the constitutionality of the amendments and also held that we have jurisdiction over both the capital and noncapital aspects of a case:

[T]he plain language of the amendments speaks of "cases in which the death penalty has been imposed" and "judgment that imposes the sentence of death." * * * Section 2(B)(2)(c), Article IV and Section 3(B)(2), Article IV, Ohio Constitution. Thus the Supreme Court has jurisdiction over the whole case, instead of counts, charges, or sentences.

(Emphasis deleted.) *Id.* at 104.

{¶ 14} Next, we considered whether the constitutional provision granting this court appellate jurisdiction over cases in which the death penalty was imposed precludes a court of appeals' review of a trial court's ruling on postconviction motions. *Davis*, 131 Ohio St.3d 1, 2011-Ohio-5028, 959 N.E.2d 516. We rejected the argument that this court "has exclusive jurisdiction over *all matters* relating to a death-penalty case" and held that "a court of appeals has jurisdiction to consider a trial court's denial of a motion for leave to file a motion for new trial based on newly discovered evidence in a case in which the death penalty was previously imposed." (Emphasis sic.) *Id.* at ¶ 22. We recognized that the constitutional amendments prohibited a court of appeals from reviewing a

judgment imposing a sentence of death. Ohio Constitution, Article IV, Section 3(B)(2). But the amendments did not prohibit a court of appeals from exercising jurisdiction in other aspects of death-penalty cases.

{¶ 15} *Davis* involved a motion for new trial. Therefore, we focused on whether the courts of appeals retained *any* jurisdiction in cases in which the death penalty had been imposed because the constitutional amendments had removed the courts of appeals' jurisdiction over the direct appeal of a death sentence. We held that they did. *Id.* at ¶ 22. Now, the question is whether the General Assembly may limit the courts of appeals' jurisdiction in a statute that specifies that this court has exclusive jurisdiction to hear appeals of the rejection of DNA testing in cases in which the death penalty has been imposed. We hold that it may.

{¶ 16} Under the Ohio Constitution, in cases in which the death penalty has been imposed, our jurisdiction overlaps with that of the courts of appeals. Article IV, Section 2(B)(2)(c) provides that we have appellate jurisdiction over direct appeals from the courts of common pleas "in *cases* in which the death penalty has been imposed." (Emphasis added.) In contrast, Article IV, Section 3(B)(2) states that courts of appeals have jurisdiction "as may be provided by law" over all judgments and final orders but then continues with the specific exception that those courts do not have jurisdiction "to review on direct appeal a judgment that imposes a sentence of death."

{¶ 17} The dissent contends that the Ohio Constitution limits the jurisdiction of this court in death-penalty cases to review only the appeal of a judgment imposing a sentence of death. In support of this interpretation, it repeatedly cites a single sentence from our decision in *Davis*: "The *foregoing language* limits the jurisdiction of the Supreme Court to the appeal of a judgment sentencing a defendant to death." (Emphasis added.) *Davis* at ¶ 15. The dissent attributes the phrase "The foregoing language" solely to Article IV, Section

7

2(B)(2)(c) of the Ohio Constitution. This is incorrect. The paragraph immediately before the sentence in *Davis* quoted R.C. 2953.02 rather than the Ohio Constitution. Although this statute was amended to reflect the changes to Sections 2(B)(2)(c) and 3(B)(2), it does not mirror the language of the Constitution. R.C. 2953.02 provides, "In a capital case in which a sentence of death is imposed * * *, the *judgment or final order* may be appealed from the trial court directly to the supreme court as a matter of right." (Emphasis added.) In contrast, Article IV, Section 2(B)(2)(c) states that we have appellate jurisdiction in "direct appeals from the courts of common pleas or other courts of record inferior to the court of appeals as a matter of right in *cases* in which the death penalty has been imposed." (Emphasis added.) To the extent that the statute appears to limit our review solely to the actual judgment entry imposing death rather than to all final orders or judgment entries in capital cases, it conflicts with the Constitution, and the Constitution will control.

{¶ 18} Even if *Davis* were read to mean that "foregoing language" referred to all previous 14 paragraphs, *Davis* addressed the court of appeals' jurisdiction, not this court's jurisdiction, over an appeal of an order denying a motion for new trial. The dissent's interpretation that our jurisdiction is limited to reviewing judgments of death on direct appeal from the trial court rests on dicta.

{¶ 19} The dissent's interpretation is not consistent with the intent behind the amendments to the Ohio Constitution. "It is a generally accepted premise that courts must interpret the Constitution broadly in order to accomplish the manifest purpose of an amendment." *State ex rel. Swetland v. Kinney,* 69 Ohio St.2d 567, 570, 433 N.E.2d 217 (1982). The general public's dissatisfaction with the long delays that pervaded the death-penalty system was the background for the constitutional change. *See Smith*, 80 Ohio St.3d at 95, 684 N.E.2d 668. The constitutional amendments to grant the Supreme Court jurisdiction over direct

appeals from the trial court in cases in which the death penalty was imposed was the solution adopted by Ohio voters to eliminate that delay.

{¶ 20} Therefore, when reading Article IV, Sections 2(B)(2)(c) and 3(B)(2) of the Ohio Constitution in pari materia, we conclude four things. First, the Ohio Constitution grants the Supreme Court exclusive appellate jurisdiction for direct review of judgments in which the sentence of death is imposed. Second, the Constitution specifically excludes the courts of appeals from the direct review of those same judgments. Third, this court has concurrent appellate jurisdiction with courts of appeals to review postconviction judgments and final orders in cases in which the death penalty has been imposed. Fourth, because grants of jurisdiction to the courts of appeals in death-penalty cases are only "as provided by law," the General Assembly may limit the court of appeals' jurisdiction.

{¶ 21} We have previously interpreted Article IV, Section 3(B)(2) to mean that "the state has no absolute right of appeal in a criminal matter unless [it has been] *specifically granted such right by statute*." (Emphasis added.) *State v. Fisher*, 35 Ohio St.3d 22, 24, 517 N.E.2d 911 (1988). For example, the state's right to appeal in criminal cases is governed by R.C. 2945.67(A):

> A prosecuting attorney * * * may appeal as a matter of right any decision of a trial court in a criminal case * * *, which decision grants a motion to dismiss all or any part of an indictment, complaint, or information, a motion to suppress evidence, or a motion for the return of seized property or grants post conviction relief pursuant to sections 2953.21 to 2953.24 of the Revised Code, and may appeal by leave of the court to which the appeal is taken any other decision, except the final verdict, of the trial court in a criminal case * * *.

Because the state has no statutory right to appeal a final verdict, a court of appeals does not have subject-matter jurisdiction to entertain appeals from not-guilty verdicts. *See State v. Lomax*, 96 Ohio St.3d 318, 2002-Ohio-4453, 774 N.E.2d 249. We have also issued a writ of prohibition to prevent a court of appeals from exercising jurisdiction over the state's claimed appeal as of right of the grant of a motion for a new penalty-phase trial. *See State ex rel. Steffen v. Court of Appeals, First Appellate Dist.,* 126 Ohio St.3d 405, 2010-Ohio-2430, 934 N.E.2d 906. We concluded that the court of appeals lacked jurisdiction because the state did not have an appeal as of right and its request for leave to appeal was untimely filed. *Id.* at ¶ 35.

{¶ 22} R.C. 2953.08(D)(1) is another example of a statutory limit on a court of appeals' jurisdiction to hear an appeal. That section provides that "[a] sentence imposed upon a defendant is not subject to review under this section if the sentence is authorized by law, has been recommended jointly by the defendant and the prosecution in the case, and is imposed by a sentencing judge."

*B. Constitutionality of R.C. 2953.73(E)(1)*

{¶ 23} R.C. 2953.73(E)(1) governs the appellate procedure for a death-row inmate to seek leave of this court to appeal the rejection of an application for DNA testing and excludes the court of appeals from hearing those appeals.

{¶ 24} R.C. 2953.73(E) states:

> A judgment and order of a court * * * is appealable only as provided in this division. If an eligible offender submits an application for DNA testing under section 2953.73 of the Revised Code and the court of common pleas rejects the application * * *, one of the following applies:

10

(1) If the offender was sentenced to death for the offense for which the offender claims to be an eligible offender and is requesting DNA testing, the offender may seek leave of the Supreme Court to appeal the rejection to the Supreme Court. Courts of appeals do not have jurisdiction to review any rejection if the offender was sentenced to death for the offense for which the offender claims to be an eligible offender and is requesting DNA testing.

(2) If the offender was not sentenced to death for the offense for which the offender claims to be an eligible offender and is requesting DNA testing, the rejection is a final appealable order, and the offender may appeal it to the court of appeals of the district in which is located that court of common pleas.

**{¶ 25}** Statutes are presumed to be constitutional. *State v. Hoover*, 123 Ohio St.3d 418, 2009-Ohio-4993, 916 N.E.2d 1056, ¶ 8; *State v. Collier*, 62 Ohio St.3d 267, 269, 581 N.E.2d 552 (1991). A statute will be upheld unless the challenger meets the burden of establishing beyond a reasonable doubt that the statute is unconstitutional. *State v. Tooley*, 114 Ohio St.3d 366, 2007-Ohio-3698, 872 N.E.2d 894, ¶ 29; *Collier* at 269.

**{¶ 26}** " 'It is a well-established principle of constitutional law that when the jurisdiction of a particular court is constitutionally defined, the legislature cannot by statute restrict or enlarge that jurisdiction unless authorized to do so by the constitution.' " *ProgressOhio.org v. Kasich*, 129 Ohio St.3d 449, 2011-Ohio-4101, 953 N.E.2d 329, ¶ 3, quoting *Smith v. State*, 289 N.C. 303, 328, 222 S.E.2d 412 (1976). "[N]either statute nor rule of court can expand our jurisdiction beyond the constitutional grant." *Scott v. Bank One Trust Co., N.A.*, 62 Ohio St.3d 39, 41, 577 N.E.2d 1077 (1991).

{¶ 27} As discussed earlier, the 1994 amendment to Article IV, Section 2(B)(2)(c) of the Ohio Constitution granted this court jurisdiction over the direct appeal of cases in which the death penalty is imposed. Thus, the General Assembly's provision in R.C. 2953.73(E)(1) that we have direct appellate review of the denial of an application for postconviction DNA testing in cases where the offender was sentenced to death is within the constitutionally defined jurisdiction of this court. Nor is there a problem with the statute's exclusive grant of authority in such cases to review DNA-testing applications. Because courts of appeals have such jurisdiction only "as may be provided by law," the General Assembly may limit that jurisdiction in cases in which the death penalty is imposed. The General Assembly acted within its authority when it limited a court of appeals' review to the denial of DNA-testing applications in cases in which the death penalty was not imposed. We therefore hold that R.C. 2953.73(E)(1) is constitutional.

{¶ 28} The dissent also contends that R.C. 2953.73(E)(1) is unconstitutional because it appears to violate basic guarantees of due process and equal protection. Yet neither party raised this issue,[1] and in *Smith*, we held that the direct appeal from the trial court in cases in which the death penalty is imposed did not violate the Equal Protection and Due Process Clauses of the United States Constitution. *Smith*, 80 Ohio St.3d at 100-102, 684 N.E.2d 668.

*C. Postconviction DNA testing*

{¶ 29} In 2003, the General Assembly passed Sub.S.B. No. 11 ("S.B. 11"), 150 Ohio Laws, Part IV, 6498, "to establish a mechanism and procedures for the DNA testing of certain inmates serving a prison term for a felony or under a sentence of death." The original DNA-testing statutes were only a temporary measure. Eligible inmates had one year after the effective date of S.B. 11 to

---

1. Noling argued merely that if R.C. 2953.73(E)(1) is severed from the remainder of the statute, but R.C. 2953.73(E)(2) is left intact, that subsection would then violate the United States Constitution's Equal Protection Clause.

submit applications for DNA testing. Former R.C. 2953.73(A), 150 Ohio Laws at 6512. That deadline was later extended by one year. Sub.H.B. No. 525, 150 Ohio Laws, Part IV, 6262, 6278. In 2006, the General Assembly made the DNA-testing program permanent with the passage of Sub.S.B. No. 262 ("S.B. 262"), 151 Ohio Laws, Part I, 1716. An application for postconviction DNA testing could be submitted by an eligible inmate without any time restriction.

{¶ 30} Noling's first application for DNA testing of the cigarette butt was filed when S.B. 262 was in effect. R.C. 2953.74 at that time provided:

(A) If an eligible inmate submits an application for DNA testing under section 2953.73 of the Revised Code and a prior definitive DNA test has been conducted regarding the same biological evidence that the inmate seeks to have tested, the court shall reject the inmate's application. If an eligible inmate files an application for DNA testing and a prior inconclusive DNA test has been conducted regarding the same biological evidence that the inmate seeks to have tested, the court shall review the application and has the discretion, on a case-by-case basis, to either accept or reject the application. The court may direct a testing authority to provide the court with information that the court may use in determining whether prior DNA test results were definitive or inconclusive and whether to accept or reject an application in relation to which there were prior inconclusive DNA test results.

(B) If an eligible inmate submits an application for DNA testing under section 2953.73 of the Revised Code, the court may accept the application only if one of the following applies:

\* \* \*

(2) The inmate had a DNA test taken at the trial stage in the case in which the inmate was convicted of the offense for which the inmate is an eligible inmate and is requesting the DNA testing regarding the same biological evidence that the inmate seeks to have tested, the test was not a prior definitive DNA test that is subject to division (A) of this section, and the inmate shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject inmate's case as described in division (D) of this section would have been outcome determinative at the trial stage in that case.

151 Ohio Laws, Part I, at 1732-1733. Thus, Noling's first application could be accepted only if there was no prior definitive DNA test and if he showed that the test results from the cigarette butt would have been outcome-determinative at trial. The term "definitive DNA test" was not defined in S.B. 262. The trial court denied Noling's application, holding that the DNA test prior to his trial was definitive because the analysis had excluded Noling and his codefendants as the source of the DNA on the cigarette butt.

*D. Interpretation of R.C. 2953.72(A)(7)*

{¶ 31} The DNA-testing statutes were amended for a fourth time when 2010 Sub.S.B. No. 77 ("S.B. 77") was enacted on July 6, 2010. The term "definitive DNA test" was defined in this amendment. R.C. 2953.71(U) now provides:

"Definitive DNA test" means a DNA test that clearly establishes that biological material from the perpetrator of the crime was recovered from the crime scene and also clearly

14

establishes whether or not the biological material is that of the eligible offender. *A prior DNA test is not definitive if the eligible offender proves by a preponderance of the evidence that because of advances in DNA technology there is a possibility of discovering new biological material from the perpetrator that the prior DNA test may have failed to discover.* Prior testing may have been a prior "definitive DNA test" as to some biological evidence but may not have been a prior "definitive DNA test" as to other biological evidence.

(Emphasis added.)

{¶ 32} Noling's second application for DNA testing of the cigarette butt was submitted after S.B. 77 was enacted. The trial court denied the application under R.C. 2953.72(A)(7), which provides, "[I]f the court rejects an eligible offender's application for DNA testing because the offender does not satisfy the acceptance criteria described in division (A)(4) of this section, the court will not accept or consider subsequent applications."

{¶ 33} Noling argues that the trial court failed to consider the legislative changes that defined "definitive DNA testing" before it denied his second application under R.C. 2953.72(A)(7). Noling contends that R.C. 2953.71(U) significantly changed and expanded the criteria for permitting further DNA testing. We agree.

{¶ 34} The trial court rejected Noling's second application for testing on grounds that R.C. 2953.72(A)(7) required rejection of the second application because his first application had been denied. But a subsequent application is barred under R.C. 2953.72(A)(7) if a previous application was rejected because the offender did not satisfy the acceptance criteria described in R.C. 2953.72(A)(4). Division (A)(4) refers to the criteria established in R.C. 2953.74

to determine whether to accept or reject the application. The threshold criterion requires a court to reject the application if a prior definitive DNA test has been conducted. R.C. 2953.74(A). Therefore, the new definition of "definitive DNA test" is relevant in determining whether Noling's previous application was properly denied.

{¶ 35} The trial court found that the earlier DNA testing was definitive because it had excluded Noling and his codefendants as smokers of the cigarette. Under R.C. 2953.71(U), however, a prior test is not definitive and Noling would be entitled to further testing of the DNA if he could show "by a preponderance of the evidence that because of advances in DNA technology there is a possibility of discovering new biological material from the perpetrator that the prior DNA test may have failed to discover." Thus, the trial court could not reject without further inquiry Noling's second application solely because he and his codefendants were *excluded* as smokers of the cigarette. The DNA-testing statutes now permit testing to positively identify the DNA's source. R.C. 2953.74(E) allows the trial court to order biological material from the crime scene to be compared to the combined DNA index system maintained by the Federal Bureau of Investigation or compared to any identified person to determine whether that person is the DNA source.

{¶ 36} In support of his second application for DNA testing, Noling had submitted evidence that Wilson and other individuals were alternative suspects in the Hartig murders. But neither Wilson's DNA, nor that of any of the other suspects, was compared to the DNA on the cigarette. The trial court failed to consider Noling's application in the context of the new statutory requirements— whether there is a possibility of discovering new biological material that is potentially from the perpetrator that the prior DNA test may have failed to discover. Therefore, the court erred by failing to apply the definition set forth in R.C. 2953.71(U) before dismissing Noling's second application under R.C.

2953.72(A)(7). We reverse and remand to the trial court for consideration of the second application under the current versions of the statutes.

*E. State's Remaining Arguments*

{¶ 37} The state argues that by enacting R.C. 2953.72(A)(7), the General Assembly exercised its legislative prerogative in establishing a procedural bar that prohibits subsequent DNA applications. The state asserts that the doctrine of the separation of powers precludes the trial court from accepting Noling's second application for DNA testing unless the legislature deems fit to revisit the language of R.C. 2953.72(A)(7).

{¶ 38} In *State v. Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, ¶ 48, we discussed the doctrine of the separation of powers and the interaction between the legislative and judicial branch:

> [T]he doctrine * * * recognizes that our government is composed of equal branches that must work collectively toward a common cause. And in doing so, the Constitution permits each branch to have some influence over the other branches in the development of the law. For example, the legislative branch plays an important and meaningful role in the criminal law by defining offenses and assigning punishment, while the judicial branch has its equally important role in interpreting those laws.

{¶ 39} The resolution of the issues in this case does not encroach on the legislature's policy choices. Amendments to the DNA-testing statutes expanded the criteria for permitting DNA testing. The primary issue in the present case is whether the trial court correctly applied R.C. 2953.72(A)(7) to deny Noling's second application after these amendments were passed. This is a matter of

statutory interpretation, which is a responsibility of the judicial branch. Thus, the state's separation-of-powers argument lacks merit.

{¶ 40} The state also argues that Noling's second application for DNA testing should be denied because he cannot demonstrate that DNA retesting would be outcome-determinative. The trial court, however, did not consider whether DNA testing would be outcome-determinative because the court had summarily rejected Noling's second application on the basis of R.C. 2953.72(A)(7). On remand, this will be a matter for the trial court to determine in the first instance.

{¶ 41} This decision is also consistent with our holding in *State v. Prade*, 126 Ohio St.3d 27, 2010-Ohio-1842, 930 N.E.2d 287. Although *Prade* was decided after S.B. 77 was enacted, we did not consider the recent amendments to the DNA-testing statutes in that opinion, because that appeal predated the passage of S.B. 77. *Id.* at ¶ 9, fn. 1. In *Prade*, we held that the trial court erred in rejecting a second application on the ground that the trial-stage DNA test was definitive. *Id.* at ¶ 30. The test excluded the defendant as a contributor to the DNA found on evidence from the crime scene only in the sense that the victim's DNA had overwhelmed the killer's DNA—because of the limitations of 1998 testing methods. *Id*. at ¶ 19. In *Prade,* we concluded:

> [N]ew DNA testing methods are now able to provide new information that was not able to be detected at the time of defendant's trial. We hold that a prior DNA test is not "definitive" within the meaning of R.C. 2953.74(A) when a new DNA testing method can detect information that could not be detected by the prior DNA test.

*Id.* at ¶ 23.

**{¶ 42}** The state argues that unlike the situation in *Prade*, the prior DNA testing in this case provided "meaningful information," *id*. at ¶ 29, by excluding Noling and his codefendants as smokers of the cigarette. Noling's second application, however, sought to identify Wilson or other named suspects as the actual perpetrator. Therefore, the trial court must consider whether the evidence regarding Wilson or the other suspects and the advances in DNA testing submitted in support of Noling's second application show by a preponderance of the evidence that there is a possibility of discovering new biological material from the perpetrator that the prior DNA test may have failed to discover.

### III. Conclusion

**{¶ 43}** Because the Ohio Constitution, Article IV, Section 2(B)(2)(c) grants this court appellate jurisdiction over direct appeals from the court of common pleas in cases in which the death penalty has been imposed, we hold that R.C. 2953.73(E)(1), which grants exclusive jurisdiction to the Supreme Court of Ohio to review rejections of applications for DNA testing in cases in which the death penalty is imposed, is constitutional. We also hold that before dismissing a subsequent application for postconviction DNA testing under R.C. 2953.72(A)(7), a trial court must apply the definition of "definitive DNA test" set forth in R.C. 2953.71(U) and the criteria of R.C. 2953.74.

**{¶ 44}** The judgment of the trial court is reversed, and the cause is remanded for the trial court to consider whether prior definitive DNA testing, as defined in R.C. 2953.71(U), precludes Noling's second application. If not, the trial court should consider whether new DNA testing would be outcome-determinative.

Judgment reversed
and cause remanded.

O'CONNOR, C.J., and PFEIFER, KENNEDY, and KLATT, JJ., concur.

O'DONNELL and FRENCH, JJ., dissent.

WILLIAM A. KLATT, J., of the Tenth Appellate District, sitting for O'NEILL, J.

_____

**O'DONNELL, J., dissenting.**

{¶ 45} Respectfully, I dissent.

{¶ 46} In my view, the Ohio Constitution mandates that in cases in which the death penalty has been imposed, the Supreme Court has appellate jurisdiction only over a direct appeal from the judgment imposing the sentence of death. And, because the Ohio Constitution vests jurisdiction in courts of appeals to review the final judgments of courts inferior to a court of appeals, the General Assembly does not have authority to grant that jurisdiction to this court to review a direct appeal from a trial court's denial of postconviction DNA testing sought by an offender who has been sentenced to death. Thus, R.C. 2953.73(E), which purports to grant authority to this court to review a direct appeal from the denial of postconviction DNA testing, is unconstitutional.

{¶ 47} As we recently indicated in *State v. Davis*, 131 Ohio St.3d 1, 2011-Ohio-5028, 959 N.E.2d 516, ¶ 15, Article IV, Section 2(B)(2)(c) of the Ohio Constitution "limits the jurisdiction of the Supreme Court to the appeal of a judgment sentencing a defendant to death." Because the legislature lacks authority to enlarge or modify that jurisdiction through a statute that provides for direct appeals to this court from postconviction judgments in death-penalty cases, I am unable to join the majority in today's holding, which expands the jurisdiction of this court.

### Appeals of Judgments Imposing the Death Penalty

{¶ 48} In 1994, Ohio voters approved an amendment to the Ohio Constitution that eliminated the two-tiered review of judgments imposing the death penalty that previously afforded direct appeals as of right first to the court

of appeals and then to this court. *State v. Smith*, 80 Ohio St.3d 89, 95, 684 N.E.2d 668 (1997).

{¶ 49} The amendment modified Article IV, Section 2(B)(2)(c) of the Ohio Constitution, which now provides: "The supreme court shall have appellate jurisdiction as follows: * * * In direct appeals from the courts of common pleas or other courts of record inferior to the court of appeals as a matter of right *in cases in which the death penalty has been imposed.*" (Emphasis added.)

{¶ 50} In *Davis*, we rejected the argument that "every judgment in a case in which the death penalty was imposed must be appealed directly to the Supreme Court of Ohio." 131 Ohio St.3d 1, 2011-Ohio-5028, 959 N.E.2d 516, at ¶ 18. We explained that such a holding "would be contrary to the language of the constitutional amendments and the statute and would have the effect of delaying the review of future cases, a scenario that the voters expressly rejected in passing the constitutional amendments." *Id.* at ¶ 22.

{¶ 51} Thus, recognizing that the Ohio Constitution "limits the jurisdiction of the Supreme Court to the appeal of a judgment sentencing a defendant to death," *id.* at ¶ 15, we held that the courts of appeals retain jurisdiction to "entertain all appeals from the denial of postjudgment motions in which the death penalty was previously imposed," *id.* at ¶ 22.

### Postconviction DNA Testing

{¶ 52} R.C. 2953.71 et seq. authorize eligible offenders to apply for postconviction DNA testing, and R.C. 2953.73(D) sets out the process by which common pleas courts are to determine whether an application should be accepted.

{¶ 53} At issue here is R.C. 2953.73(E), which purports to vest this court with exclusive appellate jurisdiction to review the denial of postconviction DNA testing:

A judgment and order of a court entered under division (D) of this section is appealable only as provided in this division. If an eligible offender submits an application for DNA testing under section 2953.73 of the Revised Code and the court of common pleas rejects the application under division (D) of this section, one of the following applies:

(1) If the offender was sentenced to death for the offense for which the offender claims to be an eligible offender and is requesting DNA testing, the offender may seek leave of the Supreme Court to appeal the rejection to the Supreme Court. Courts of appeals do not have jurisdiction to review any rejection if the offender was sentenced to death for the offense for which the offender claims to be an eligible offender and is requesting DNA testing.

(2) If the offender was not sentenced to death for the offense for which the offender claims to be an eligible offender and is requesting DNA testing, the rejection is a final appealable order, and the offender may appeal it to the court of appeals of the district in which is located that court of common pleas.

{¶ 54} The difficulty for me with this statute is that the denial of postconviction DNA testing by the common pleas court is not a judgment sentencing a defendant to death. Our jurisdiction in death-penalty cases is established in the Ohio Constitution, and the General Assembly cannot enlarge, modify, or diminish it. *See ProgressOhio.org v. Kasich*, 129 Ohio St.3d 449, 2011-Ohio-4101, 953 N.E.2d 329, at ¶ 3, quoting *Smith v. State*, 289 N.C. 303, 328, 222 S.E.2d 412 (1976) (" 'It is a well-established principle of constitutional law that when the jurisdiction of a particular court is constitutionally defined, the

legislature cannot by statute restrict or enlarge that jurisdiction unless authorized to do so by the constitution' ").  The state concedes in its supplemental brief that "the *Davis* Court's narrow interpretation of the appellate jurisdiction provided in Sections 2(B)(2)(c) and 3(B)(2), Article IV of the Ohio Constitution renders R.C. 2953.73(E)(1), unconstitutional."

**{¶ 55}** The majority takes issue with this view of *Davis*, asserting that it is R.C. 2953.02—not the Constitution—that "limits the jurisdiction of the Supreme Court to the appeal of a judgment sentencing a defendant to death."  *Davis*, 131 Ohio St.3d 1, 2011-Ohio-5028, 959 N.E.2d 516, at ¶ 15.  However, the problem with this assertion is that the legislature lacks authority to limit our jurisdiction when it has been expressly established by the Constitution.  The majority also makes much of this dissent's reference to ¶ 15 of *Davis*, which begins with the phrase "[t]he foregoing language."  Notably, that phrase is preceded by *two paragraphs* of quoted material, one referring to Article IV, Sections 2(B)(2)(c) and 3(B)(2) of the Ohio Constitution and the other to R.C. 2953.02.  Hence, the phrase necessarily refers to each provision.

**{¶ 56}** The majority's author, who also authored *Davis*, now suggests that the language in *Davis* meant that R.C. 2953.02 unconstitutionally limits our jurisdiction.  Majority opinion at ¶ 17. No such language appears in *Davis*, and in fact the court applied the constitutional amendments and the statute in harmony.  *See Davis* at ¶ 22.  The majority's reasoning is, in any case, unpersuasive, because it is premised on the mistaken belief that R.C. 2953.02 "does not mirror the language of the constitution."  Majority opinion at ¶ 17.  A comparison of these two provisions, however, reveals no material differences.  Article IV, Section 2(B)(2)(c) of the Ohio Constitution states,  "The supreme court shall have appellate jurisdiction as follows: * * * In direct appeals from the courts of common pleas or other courts of record inferior to the court of appeals as a matter of right *in cases in which the death penalty has been imposed*."  (Emphasis

added.)  R.C. 2953.02 similarly provides, "*In a capital case in which a sentence of death is imposed* for an offense committed on or after January 1, 1995, the judgment or final order may be appealed from the trial court directly to the Supreme Court as a matter of right."  (Emphasis added.)   Both provisions apply to cases in which the death penalty has been imposed.  Although the majority concedes that "the statute appears to limit our review solely to the actual judgment entry imposing death rather than to all final orders or judgment entries in capital cases,"  majority opinion at ¶ 17, it fails to recognize that because there are no substantive differences between the statutory and constitutional language, both necessarily have the same meaning.

{¶ 57} The majority also erroneously maintains that language in *Davis* stating that our jurisdiction is limited in these circumstances is dicta.  But setting forth the limits of our jurisdiction in death-penalty cases was necessary to resolve a legal issue framed by the court: "whether the constitutional requirement that we review all direct appeals of cases in which the death penalty was imposed includes review of appeals from a trial court's order denying a defendant's motion for a new trial."  *Davis* at ¶ 16.  Notably, the court explained that "[w]e see no reason why the courts of appeals may not currently entertain *all appeals* from the denial of postjudgment motions in which the death penalty was previously imposed." (Emphasis added.)  *Id.* at ¶ 22.  The conclusion in *Davis* that the courts of appeals may "entertain *all appeals* from the denial of postjudgment motions" follows from the holding that the jurisdiction of this court is limited in death-penalty cases to direct appeals of the sentence.  Rather than being dicta, this holding is essential to the resolution of the case.

{¶ 58} The majority then falls back on the assertion that this interpretation is "not consistent with the intent behind the amendments to the Ohio Constitution."  Majority opinion at ¶ 19.  Yet in *Davis,* the author of today's majority opinion expressly relied on the intent of the electorate and the policy of

accelerating review of capital cases in deciding that the courts of appeals do have jurisdiction over appeals from the denial of postjudgment motions in death-penalty cases. Notably, the court reasoned in *Davis* that "[a] holding that the Supreme Court has exclusive jurisdiction over *all matters* relating to a death-penalty case would be contrary to the language of the constitutional amendments and the statute and would have the effect of delaying the review of future cases, a scenario that the voters expressly rejected in passing the constitutional amendments." (Emphasis sic.) *Davis*, 131 Ohio St.3d 1, 2011-Ohio-5028, 959 N.E.2d 516, at ¶ 22.

{¶ 59} In addition, R.C. 2953.73(E)(1) purports to vest this court *with discretion* to accept or deny the direct appeal from a denial of postconviction DNA testing, stating that the offender "may seek leave of the supreme court to appeal the rejection to the supreme court." Article IV, Section 2(B)(2)(c) of the Ohio Constitution, however, provides that the appeal from the common pleas court to this court in death-penalty cases is "as a matter of right." And because the General Assembly cannot enlarge, modify, or diminish our jurisdiction in death-penalty cases, it necessarily lacks authority to grant this court discretion to deny an appeal that the Ohio Constitution allows as of right.

{¶ 60} R.C. 2953.73(E) also raises significant concerns regarding due process and equal protection in that it divides offenders who are similarly situated into two different classes: offenders who have been sentenced to death may seek leave to appeal the denial of postconviction DNA testing directly to this court while all other offenders may appeal as of right to the court of appeals and then seek discretionary review in this court if the appellate court affirms denial of the testing. Thus, the General Assembly has denied offenders sentenced to death— and only those offenders—an appeal as of right from the denial of postconviction DNA testing.

**{¶ 61}** As the Supreme Court observed in *California v. Ramos*, 463 U.S. 992, 998-999, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." Thus, I would assert that those sentenced to death should receive *at least* the same procedural protections afforded to all other offenders.

**{¶ 62}** The majority's citation of *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997), for the proposition that R.C. 2953.73(E)(1) does not violate either due process or equal protection requires little response; aside from the fact that this statute had not been enacted at the time we decided *Smith*, that case did not consider a situation in which a statute creates two classes of similarly situated offenders and gives one, but not the other, an appeal as of right from the denial of DNA testing. *Smith* simply has no application in this regard.

**{¶ 63}** After today's decision, every postconviction judgment entered in cases in which the death penalty is imposed is potentially subject to a direct appeal to this court, notwithstanding *Davis*. But we are not an error-correcting court; rather, our role as the court of last resort is to clarify confusing constitutional questions, resolve uncertainties in the law, and address issues of public or great general interest. The duty to review error allegedly occurring in postconviction proceedings in death-penalty cases, in my view, belongs in the first instance to the appellate courts of this state. Significantly, appellate courts consider assignments of error, while this court considers propositions of law. The two are materially and substantively different.

## Conclusion

**{¶ 64}** The Ohio Constitution, Article IV, Section 2(B)(2)(c) establishes the appellate jurisdiction of this court "[i]n direct appeals from the courts of common pleas * * * as a matter of right in cases in which the death penalty has been imposed." R.C. 2953.73(E) purports to enlarge the constitutionally defined

jurisdiction of this court, and because the legislature lacks authority to amend the Constitution, I would hold that this statute is unconstitutional.

FRENCH, J., concurs in the foregoing opinion.

_____

Victor V. Vigluicci, Portage County Prosecuting Attorney, and Pamela J. Holder, Assistant Prosecuting Attorney, for appellee.

Ohio Innocence Project, Mark A. Godsey, and Carrie Wood; and Timothy Young, Ohio Public Defender, and Jennifer A. Prillo, Assistant Public Defender, for appellant.

_____